Today is Tuesday, October 4th, 2016. We are in my house with two daughters and I have four children. I live in Washington, D.C. My family's on the 7th and I have two sons and a mother that lives in Washington, D.C. We are going to do a family fun haul in just to see how it goes. Today is Wednesday, October 4th, 2006. We are in the Howard T. Markey National Courts Building at 717 Madison Place NW, Washington, D.C. We are preparing to have oral arguments this morning at 10 o'clock in both courtrooms, 201 and 203. Is there anything else that you would like to add? I'm pleased to welcome a visiting judge, the Honorable Patty B. Serris, from the United States District Court of the District of Massachusetts. Judge Serris is an experienced district judge who has taken an interest in our court's work and we were delighted when she accepted our invitation to sit with us. And we look forward to sitting with her not only today and tomorrow, but in the future as often as she is willing to volunteer. The calendar day has four argued cases. For the benefit of counsel, I assure you that we have read your briefs and we have an understanding of the arguments and you shouldn't waste your time on recitations of the facts or the procedural background of the case. Get right to the arguments that you want to impress upon us today. Very well, with that said, we'll have argument first in number 05-1434, Anderson v. Fiber Composites. First up then is Mr. Schultz. Thank you, Your Honor. May it please the Court, with me are Mr. Oakland and Becky Gorsh and the Honorable Briefs. Fiber Composites and Anderson do agree about one thing, and that's that the district court got the claim construction half right. And I'd like to talk about the half that the district court got right. And that's on what has been referred to in the papers as the Group 2 patents or the structural member patents. And if you just go through a standard analysis, you're going to come out exactly correct, exactly where the district court did. There's nothing complicated about the claims of the Group 2 patents, the structural member patents. Claim one of the 027 patents, as an example, says that it covers a wood thermoplastic polymer composite structural member. It has certain characteristics of that that are recited in the claim. And if you then move next from the claim language of the claim, look at the specification, it's very clear that right at the beginning, it says the invention relates to an improved structural member. And in fact, structural member is even defined in column three of the 027 patent, which you can find in the appendix at page 135. It gives a meaning. It says the term structural member, for purposes of this application, means a linear member with a regular cross-section or complex cross-section. Again, there's nothing particularly surprising about what the district court did in this case. The district court came to the right conclusion in fiber composites, however, would ask this court to impose what in essence would be a process limitation or a form limitation and say that it's limited to a pellet or a process to make a pellet. Let me ask you about the prosecution history. I assume you were going to get there next, but let's jump directly to it. And in particular, the remarks regarding the Miani composite at A4116 to 4117. You're familiar with that passage. And in particular, the language in contrast, and this is in contrast to statements made about Miani. The presently claimed composite is prepared by mixing the melted polymer and wood pulp, forming pelletized material, cooled, and then extruded. This is to distinguish from Miani in which the statement was made at 4117 that the composite was directly extruded and kept hot during the entire operation. Why isn't that a disclaimer? I'm glad you asked that, Judge. And to begin with, we need to go back two pages. And we need to go to the appendix at page 4115. And keep in mind that this was the first response to the first office action on the parent application. And the applicant was confronted with rejections over several pieces of art, including Miani. And the applicant said, and this is at the bottom of A4115, I quote, applicants respectfully disagree and have indicated in the specification that prior to the present invention, previous polyvinyl thermoplastic materials combined with wood products have not resulted in a sufficient Young's modulus as claimed in the composite herein. This is made clearer by applicants' claims now amended, which point to an important element of the present invention, which is the size of the wood fiber used in the composite having such a large modulus. So we have that language. Then there's some discussion that's not particularly relevant. And then we have the statement that you referred to, Judge Bryson, about the extrusion process. But you then need to go on and look at what, in fact, the amended claims were. And he added an aspect ratio limitation to the claim. So the whole tenor here is this invention has to deal with certain characteristics not otherwise found in the prior art. And it really has nothing to do with how you get there. So if we step back and we look at the claim language again, and it talks about a composite structural member. So when you say it doesn't have anything to do with how you get there, it seems to me that the language I just read says exactly the opposite of that and says that it has everything to do with how you get there. At least the distinction from Miani has everything to do with how you get there. I mean, it certainly is the case that you could have a composition claim, which you could say ought to be construed to be limited to compositions which are made in a certain way. I mean, that would be a disclaimer of compositions made in any other way. I think you'd agree with that. If we look at the law of this court on disclaimer, disclaimer has to be clear and unambiguous. And if we look at the Phillips case where it says, you know, look at the claim language and the spec, and then you have to look with a little bit of a, you know, with a grain of salt, so to speak, on the prosecution history. And this is the only statement in the prosecution history of the 027553 patent, even though there were a couple of continuation applications and a lot of other prosecution cases. That's all I can point to. It's not a clear disclaimer. And what's really important here is what comes out of the extruder. But if you put that together with the specification, the number of statements saying the invention is and refers to the pellet or the linear extruder, I mean, isn't, if you put the whole picture together, both the specification and the prosecution history, doesn't it look like a disclaimer? If you look at the difference between the group one patents… I'm referring to group one. Okay. And of course we were talking about group two. Let me see if I understand. Yes. I had the same question. Yes. You started off, I think, saying you were going to go directly to group two. Yes. So you're skipping over for now group one. Do I understand that correctly? Yes, because I interpreted your… Group two, correct? Yes. Okay. So we're, for now, we're not getting into the group one patents as a disclaimer issue with that. We're talking… We're talking group two. Still we're talking about structural… I was a little… I understand now. But in response to Judge Serris' question, I wanted to just contrast the difference in the specification because there are some substantial differences in the specifications between the composite composition patents and the structural member patents. If you look again at the spec of the structural member patents, it's very clear that we're covering a structural member, that we're covering the end product that comes out of the extruder. It says right in the beginning. There's really no claim here that we're covering some intermediate or that some process comes into play here because it's clearly covering the end product. In my view, I think the specification is very clear here. I'll have to concede that when you're looking at the group two patents, there are some different issues with respect to the specification. Now you mean group one. You mean group one. I'm sorry. Group one. I jumped too quickly to group one, but that's where you seem to have such a problem. Well, I'm more than happy to go there now if I've satisfied everybody's… Before you get there, could you tell me, just as a practical matter, why does the group one… You start your appeal with group one. Why does it matter in terms of just on the street consequences? Is it because you want to get back into the willfulness or is there a collateral estoppel issue lurking here? Because it looks to me like you're not apt to get any more money out of the case, at least on the straight infringement, because these groups of patents seem to be coterminous in their scope. That's an excellent question, Your Honor. On the street, in the competitive environment, we would like those patents back to cover what fiber composites did and what others may be thinking about doing. We would like the ammunition in a highly competitive environment of having six patents instead of two. But is that just because there's different coverage or simply because six of anything is better than two of anything unless all of them are bad? Well, at some level in the environment in which all our clients operate, six is better than two. Okay, so that's what we're here laboring over is the proposition that six is better than two. Well, I think we're laboring over several things, Your Honor. Primarily, and that's why I led the argument off, the group two patents, the structural member patents, the court got it right and they're infringed. What's interesting, though, about the group one patents and the court's claim construction there is the denial of summary judgment on their use, fiber composite's use, of an intermediate. If you go back and you look at the court's claim construction and the summary judgment proceedings, the court basically said, look, the composite composition claim, because of things that Judge Sarris pointed out, it covers a pellet or a linear extrude, basically an intermediate, not the final product. And the court held the group two patents clearly cover a final product, doesn't matter about the intermediate, which is correct. However, and this is why we ask you, in essence, even if you adopt the district court's claim construction on the group one patents, to send it back on the issue that summary judgment was entered against us on what's called the repro. Because what they do, as you know from looking at the materials, is they have rejected railing parts that are extruded, and then they chop them up, and they then feed them back into an extruder. So they, in fact, are, it's not just powder and wood fiber that they put in an extruder, they put powder and wood fiber and then they also toss in this, what I'll call, probably an intermediate product. And even their experts admitted that it's a linear extruding. So if you take the claim construction of the group one patents, why isn't, and I'm pointing opposite page 43, and the court has seen this, this is the chopped up repro that the court held did not infringe as a matter of summary judgment. Is that a blow-up photograph, by the way? I believe it's in Fiber and Process' brief. I thought there was a copy in both briefs. I don't think there is. We may have it in the appendix, but I'm not sure if it's a blow-up. I don't know. One of the responses was that you didn't put in a case that each one, those little, what would you call them, the repro products met all the limitations of the claim. Well, that's not right. If you look at the report of our expert, Robert Lupinen, and we cite at the appendix, and I'll get that here in a second. In the appendix at pages A1140 through 73, we have not all but a good part of his expert report, and he opines that the repro, in fact, infringes, and here's his analysis summed up in a nutshell, which is you have a product that comes out of the extruder that's defective, maybe warped or something like that. That product has been, samples of that type of product have been tested and meet the claim limitations. It's chopped up, and it's fed back into the extruder. So it, in fact, through what is very easy, circumstantial evidence, in fact, infringes. But the court held that we didn't even get to present that case. Your yellow light is on, however, I expect that given the complexity of this case and the number of issues that we'll go over. So I don't think you should worry unduly or rush yourself as you go into the other issues that you'd like to address. At some point we will have to move on, but we would like to give you an opportunity, and Mr. Skinney an equal opportunity, to address some of the issues beyond this. But having said that, let me bring you back one more time, if I could, to Miani, because this was something that looked conspicuous. Could I just stay on the point that he had? Of course. Just on the point that you made, just to go back to Judge Bryson's earlier question about what the real dispute is here and what the ramifications are of what we do. Even if we agreed with you on the repro, on the issue you were just talking about, does that have any consequence in terms of additional money? We're still left, are we not, with the sum awarded on the group 2 PAC? I'm not sure because I haven't gone back and looked at the time period over which they might have been using the repro. It might cover a different time. I just don't know the answer. Well, on Miani, I took your answer and I was trying to sort out whether you were saying either A, that there's a lot of material going the other way and therefore regardless of the actual statement made by the prosecuting attorney with regard to Miani, that statement is sort of overwhelmed by contrary evidence as to the scope of the patent and should be disregarded, even if it would in isolation be treated as a clear disclaimer, or B, that there is an explanation for that statement that is consistent with a reading of the patent that is as broad as you submit it should be read. Well, it would certainly be in the sense that... What's the explanation then for the statement the presently claimed composite is prepared by mixing the melted polymer and wood pulp forming pelletized material? Because that sounds to me, if you take that sentence, this is B now, if you take that sentence, it looks to me as if that's saying that composite equals pelletized. You need to take that in the context of not even several office actions later, but in the same office action response that said, look, we are confronted with Miani and these other references, and here's the problem with those other references, and this is with respect to Miani as well, it's look at our modulus, look at the fact that we're a thermoplastic and not a thermosetting material, and we're going to make an amendment when confronted with this prior art, and we're going to add aspect ratio. That's what we're going to add. And we're covering a final product. When you get to this pelletizing issue, it's important to step back, especially with regard to the structural member patent, and keep in mind that we don't care what goes into the extruder. In fact, in the 334 patent, there's a statement made on page 18 of the red brief that says, and I'm quoting, nowhere in the specification of any of the six patents is there any mention of making a structural part without a critical pelletizing step. Well, the 334 patent in the first column says you can direct extrude. Now, even though that's in the group one patents, it's important, I think, one important fact to keep in mind. But going back to the group two patents in Miani, the pelletizing, even if what Miani, in fact, did, and even if our preferred input into the extruder is a pellet, and it says that, that's our preferred input into the extruder, we're not talking about a process, a method, or what goes into the extruder, we're talking about what comes out of the extruder. It clearly says a structural member. It's what comes out at the end. Well, but the sentence, again, bringing you back to that sentence, and this is B, can you read that sentence in a way that's consistent with your claim construction, is about how it's prepared. It uses the word, is prepared by mixing. That's what you're saying, or the prosecuting attorney is saying, is our invention. So, in terms of just looking, setting aside context, is there an explanation for that sentence that is an innocent explanation in the sense that it's consistent with the construction that you're urging for the group two patents? I think there are a couple of explanations for that, Your Honor. One, there's no evidence in the patent office never said, or conceded, that Miani had the characteristics that were claimed. In other words, a structural member of these characteristics, and in pointing to how Miani made it. But that doesn't matter, does it? I mean, our law, it seems to me, says the following. You tell me if this is not a fair characterization. You have a patent application to eschew, and you are confronted with a prior art, and the examiner, well, never mind what the examiner, the examiner cites the prior art to you and says, reject. And you say, well, you can't reject on the basis of that prior art, because that prior art has leather soles. Our shoe has rubber soles. Once you say that, it doesn't matter whether the prior art has leather soles or not. What matters is you've said what your invention is.  is this a characterization of your invention? It is not a characterization of our invention that should be deemed a disclaimer, especially if you look at the very first thing we said about this prior art, page 84115, that says we disagree, and have indicated in the specification that prior to our invention, previous PVC materials and wood did not have sufficient modules. And then we go on to amend in light of that art by adding not some process limitation, not a form limitation, not an intermediate limitation, but a structural limitation of the size of the wood fiber. That's what we do in response to this art. That's how we view the art and how we view ours as being different. Okay. Now, are there other issues that you've not had a chance to address that you'd like to address, because we will give you a little extra time if you're... I guess I'd like to reserve it for rebuttal. Well, we'll give you your full rebuttal. I'm actually inviting you to... if there's another issue. Well, there is. I'd like to talk about the anticipation issue. Briefly, in this case, the anticipation issue involves a modern plastics article. And the issue there, a couple different issues there. Number one, they claim it's a modern plastic article. I guess that's a cross-appeal issue, right? It is a cross-appeal. Why don't you wait on that? Let me ask you then one quick question about the injunction question. And that is, with respect to the court's denial of your injunction, why don't you have an adequate remedy in law? If we have to... The benefit of the injunction, of course, is that if they start manufacturing the product again, that we have the benefit of contempt here, as opposed to having to go in and file a new patent. And this is something that they haven't done, that they stopped doing six years ago? They stopped doing, and there's some indication in the record that we had thought that they were back in the claim range. And, you know, they're kind of right at the edge. And so they decide that they, for either financial benefit, because we think from an economic perspective, wood's a lot cheaper than PVC. And so they reduced their wood content below 30%. But at some point, the economics of PVC, especially being a petroleum-based product, may be such that it's handy to throw another 5% wood in, which comes right back into our claims. You know, you briefed this before the eBay case. So do you think that in any way changes things? It looked as if the judge looked at four factors, although very shorthand. Well, that's an interesting point, Your Honor. The judge did... Everybody briefed in post-trial the four-factor test. And so it covers what... I don't think eBay really has an impact on that. But the judge just kind of blew off the analysis and said, I really just don't think an injunction's appropriate here. It just never really did the kind of analysis that you require. But that's an interesting question. In eBay, they dealt with the factors you have to consider in terms of issuing an injunction. But here the court decided to deny the injunction. Does the court have to analyze all four factors in terms of denying it? I mean, if the court finds one of those factors is deficient, why does the court have to reach the other factors in the context of a denial, not a granting? That's probably a fair comment. I'm not sure, if you look at the record, that the court analyzed really any factor itself. She just kind of blew off the whole idea of the injunction. But you mentioned the... I'm sorry, we have no question here. You mentioned the contempt versus new action, which, of course, is a concern I know as it animates a lot of these disputes. But isn't that present in every injunction case, in every case in which an injunction is denied? You have that argument for why an injunction should have been granted. And if that were so, then we would have gotten eBay right for a different reason. I'm keenly aware that we've been told that we didn't. I actually think that on its facts, you probably got eBay right. Well, you have nine people at least that disagree with you. In any event, I think that if you look at the factors here, this is a situation where we are in fact... operating under our patent. We may not be making debt ratings, but we're making a lot of product under our patent. We've licensed somebody else in the same area, Trex, under this. And I think it's important, because we are practicing a patent, that we've got a licensee out there who's been licensed under these patents that's in the same area, that we have the benefit of an injunction so we can bring a contempt motion to combat the misconduct. Okay. Very well. We'll reserve your full rebuttal time, and you can address at that time any of the cross-appeal issues that may arise. Great. Thank you. Thank you, Mr. Skinion. Now, could you... Mr. Schwarzwald, could you add the similar amount of time to Mr. Skinion's time? I think it's... What was it, about an extra 8 minutes or so, was it? Okay. All right. Very well. Thank you. May I please declare? I think I can deal with that key point construction issue from the point of view of both patents, both groups of patents, kind of together. Because the thing of it is that these patents came out of the same research project, the same invention, if you will. And what Henderson has proposed here for essentially both groups is what they call plain meaning. And essentially, the only thing plain about the meaning they propose is, number one, it wasn't what they invented. It's disclaimed in the specifications of both groups, and it was disclaimed in prosecution. What they invented, as is clear from what the inventor's testimony was at the trial, was that they got a polymer and wood extrusion that had better strength properties and thermal expansion properties than the prior art could get. And they put those values in most of the claims, those modulus value and the thermal expansion value. There's a minimum modulus value in most of the claims. There's a maximum expansion, thermal expansion in most of the claims. And both sets of patents make it clear that they had only one way to get that. And it was a direct result of the process they used. And that was the pelletizing process, where they do a two-step operation. First, they prepare the pellets. And actually what happens is they say in their patent that you prepare the pellets, you orient the fibers, the wood fibers in the pellets, you control the moisture of the pellets, and then you cut the pellets from the linear extrudate that comes out of the die. And later on, what you do is you take those pellets or the linear, solid linear extrudate, and you dump them in another hopper, and you extrude the actual structural metal. Is there any distinction between, for purposes of the process of obtaining the advantages of the patent, between pelletizing and simply linear extrusion before the chopping into the pellets? There isn't anything that's indicated in the patents themselves. And it would seem to me that probably it just deals with the ease of handling. The pellets are easier to handle, they're no longer spaghetti strings. One of the problems that I encountered in thinking about the case is that you, in your brief, refer in a shorthand fashion to pelletizing, and you point to various places in which pelletizing is emphasized. And what became a little unclear to me is whether you meant every time you referred to pelletizing to include linear extrusion, as the term is used in the patent. Yes, because as a practical matter, the only difference in the process is chopping up what comes out of the die. Then that makes the references to pelletization a little less crisp, of course, because in the prosecution history and so forth, it is said, well, the key to our invention is pelletization. You're really saying, well, they don't really quite mean that. They mean linear extrusion, which sometimes results in pellets, right? Is that a fair characterization? I think in part, Judge. And what I would quarrel with is that when you were dealing, particularly in the Group 1 patents, for example, when you were dealing with just the composition, you have claims in individual patents directed to pellets, independent claims directed to pellets, linear extrusion, and then the composite material. When they address that pelletizing comments, when they make pelletizing comments in that original set of prosecution history, they always refer to that globally. When they were talking about pelletizing, it was global. It referred to all three groups of claims. They never made a distinction between how they were using pelletizing in that prosecution history and between pellets, linear extrusion, and composite material in the claim. That's all the Group 1? All the Group 1 claims, yes, Your Honor. That's correct. So when they were arguing pelletizing here in the prosecution of the Group 1 claims, that's what they were arguing. It applied to all of them because that's what they wrote. That's the only way that they could get those approved measurements that they rely on here, and Mr. Schutz referred to as being distinctions over the prior argument. Well, maybe your response was to address the problem that I was having, but just to make sure, let me ask the question a different way. When you recite a statement made in the prior, this actually was in the prosecution history in response to prior art, the recited invention is a rosin and fiber composite thermoplastic pellet. Yes. You do not intend by that reference to argue that it excludes linear extruding, as I understand it. That's correct. So the word pellet we already know doesn't quite mean in that context pellet, and pellet alone. So we've already broadened the word a little bit, and my question is, isn't that word then being used in less than a very precise, restrictive fashion in the prosecution history? You understand my question? Yes, I do, and I think that's correct. Yes, to that extent. So why do we limit to linear extruded as opposed to the composition without having pulled it out in a certain way and chopped it up in a certain way? Pellet, in other words, can that be regarded as kind of a shorthand for the various forms in which this substance can be presented? It owns a solid form. The commonality between linear extruded and pellet is it's solid. What is different between what they accuse of infringement here, at least initially in the case, was the fact that we were dumping our composition as powdery polyvinyl chloride and so on. It's not a solid form. And so what they did in the prosecution was each time, and it's repeated throughout that one prosecution, each time that they were confronted with any type of rejection in it, they came back to it's the pellet that's consistent with the specification, which says, and the group one makes it absolutely clear, in order to get a structural part here, a good structural part, pelletizing is required. And I think in that sense, the pelletizing, that's in the summary of the invention section, and the summary of the invention section saying it's required to use pelletization. And that means in terms of the linear extruded that could be used. And that's all group one. That's all group one. And so where we have it with that is, and what group one claims is, to make it clear, actually, that they're talking about the composite claims as also being a solid, in the district court's construction about the pellets or linear extrudates, is that in the group one claims, and a lot of them for the composite, they put in an almost modulus value for the composite. And that can only be measured with a solid. The patents themselves refer to the ASTM test, which is a test on a solid part. It's a tensile modulus test to cut the piecing and the stretching. Now you've, understandably, I think Mr. Schutz talked initially of group two, and you have talked largely about group one. Why don't we focus on group two, to the exclusion of group one. And I had an exchange with Mr. Schutz about Miani, and I understand your argument about that. I am less certain about how far you go with the specification. I see that you do cite, well, in the 553, you cite column 10, lines 30 through, looks like 48. But that doesn't seem to me to have the kind of force that some of the group one statements, both in the specification and in the prosecution history have. What's your strongest, is that the strongest piece of ammunition you have from the specification of group twos? I think there are two thoughts on the specification. And I think one of the things on the specification is at the beginning of the summary of the dimensions section, it again talks about how to obtain this, this is the we have found that the successful manufacturing physical properties passage, that's 553, A148, 553, column two at the bottom. I think that's the same passage. It shows up in the other patent too. There's a similar one in 227. Right. The same language. But yes, that's right. What it says here is that it talks about in terms of that, that what's required to get this composite structural piece that can replace wood, it requires intimate mixing and intimate contact between the polymetric material and the fiber. But there's no reference in that passage as far as I could see to pelletization, just mixing. Just mixing. So if you can mix without pelletizing, I mean, I know your position is that nobody told us how to do that, but at least for purposes of clean construction, this does not seem to confine the invention to pelletization. By itself, perhaps not. Okay. The specification, now we know from the summary here, that this mixing is absolutely critical. The mixing step is absolutely critical to obtain these results. And that's consistent with the group one claims too, to obtain the Young's modulus results they're talking about, just to take that as an example, because that's in most of the claims, in all of the claims certainly of the group two that we're serving in this system. They had to do this mixing of the polymer and the wood fiber as it's described here, intimate mixing. We're talking about intimate mixing. But it's not a method claim. No, it's not. So there are other pieces of this specification that make it look as if it's a replacement for, for example, wooden structural members. So it's a lot tougher for you through the specification here. For the specification, but then tied in with the prosecution, and I'm going to do that in a second. But if you think of the specifications a little bit more exalted. Yes. It's a tougher case for you. By itself, yes. Because they don't make the statement in that summary that they're talking about pelletizing. But remembering this is still under the same inventive concept, the same invention, whereby in this case, the only way, the only evidence that exists along the trial that's in any of the briefs that allowed them to make these young modulus values of this ultimate part was by pelletizing first. That's a mission by their inventor, a trial. It's consistent with the group 1 point, it's consistent with group 2. The reason it's consistent with group 2 is because if intimate mixing is so critical to that part, what did they describe as the method for doing it in the group 2 papers? They described only one thing, and that's that same pelletization method. That's the only thing they described, and then at the end, which is the portion of specification you referred to, Mark, which I think is at 10, it attributes, in the group 2 patents, it attributes these improved measurements, the improved young modulus measurements to the pellet of the process here. So what we have here is them telling you in the summary of the invention, in order to get the proper structural part, which nobody in New York could do before using a polymer and wood fiber extrusion, they couldn't do it however they were extruding it, we say this intimate mixing where we arrange the wood fibers and we elongate them and we control the moisture, that's critical to this, to getting these improved results. And the way they disclose in the patents is the pelletization, nothing else. There is not one bit of description, any place in these patents that describe preparing these things any other way. So now when we're talking about, we go to the claims, and the claims on their face talk about, the actual key phrase at the beginning, I think, is a composite structural member suitable for use as a replacement for a wood structural member. So it's a replacement part for something that is very strong, has a Young's modulus value of a minimum of 1.5 million PSI. That's what we saw. So they're looking to have that composite structural member replace wood, and they put in the claims the Young modulus value, right at the outside, that they only describe as being available from using a pelletizing process, in which in the specification they say it should be the result to the pelletizing process, and at the beginning say it's intimately mixed, and that's how they describe intimately mixing. In effect, they're saying that whatever you were doing before to make this thing, in a prior art, you weren't intimately mixing it, and this is how you do it. So on its face, the claim does not include a process step, but then in connection with, and I think the key part is that mynamic part, well, not the only part in the prosecution history, in the very first office action that they're confronted with, in the original application, that's the parent of the 553 and the 027 Act, in that very first one, they deal with mynamic. And although they make other arguments, that argument actually says, talking about mynamic, furthermore, the composite is directly extruded and kept hot during the entire operation. That's how they construe mynamic, and then he contrasts that by saying, this type of composite, which is the claim term, is not the composite taught by the present invention. In contrast, the presently claimed composite is prepared by mixing the melted polymer and wood pulp, forming pelletized material. There is not one method step in any of the claims that they're addressing that argument to. But they told the patent office what they really had invented here, and in so doing, they defined composite in those claims as certainly excluding any direct extrusion process, which is what fiber composites does, and limiting it to the pelletizing process. That's not the only time they do this. He says, later on in the prosecution of the next application, which is really the application that became the 553 patent, they added the word thermoplastic to the claims. It now becomes thermoplastic composite material. And what they did then was define, when they added that, by saying the following, the use of thermoplastic polyvinyl chloride and wood fiber in a composite pellet used in the thermoplastic process to form the structural member would result in a thermoplastic composite member. That's the term for the claim. Once again... I read that over, and you did feature it in your brief, and I see the point of the argument but it didn't seem to me it has the kind of... it has an inclusive feel as opposed to an exclusive feel, and the exclusive feel is much more useful in assessing disclaimer, it seems to me. This is saying what is included and the absence of any broader inclusion may be at some probative value, but it's not... it doesn't seem to me quite the same as saying this is what it's not. That may be so, but the larger question is, if the claims are as they say it is, why would you even make the statement? Why would that statement even be there? And the reason is that a lot of the art they were dealing with had no pelletizing in it. So all of a sudden, now they're back at this time focusing on what their invention truly was, which was pelletization. That's what they thought they had invented. Can I ask you this question, which wasn't alluded to in the briefs, and perhaps it's not in the record, and if so, don't go there. Is there any indication in the record as to what your product does to achieve the kinds of properties that are touted for the patented product as you view it, limited to pelletization, without pelletization? Not specifically, because originally our process was something that was set up by another company who licensed the technology from us. So no, there is no specific reason. I don't know why. I'm not sure we've moved on to infringement yet, but how do you deal with... Did you have anything else you wanted to say? Suppose we went with the district court's claim construction on the group one patents. Where in the record does it talk about... You claim that Anderson didn't put in enough evidence to show infringement by the repro. He says yes. Could you spell out your argument a little bit more? The argument is simply this. The only thing that they had tested for, because we're dealing with numbers and modules and coefficient expansion limitations in these claims, among other things. What their expert did was buy... They bought some product of ours at a store, some product at Ritzel, and they tested that. The full number? Yes. The post and the spindles and the top reservoirs. They tested that. That's how he came to his conclusions as to what was in it and how those modulus numbers looked. But that's not the repro. I think the repro picture is an actual... It's not going up. That's what it looks like. I think that is what it says. He claims that's circumstantial evidence and it's enough to meet the burden. Where it comes from is a rejected part that they've never tested. Because this comes belatedly, they never asked to test. Essentially, in order to prove infringement of that, you would have to prove that the repro not only met that limitation, but was in fact met all the other limitations in the claims. So you're saying because it was a reject, you can't use it as circumstantial evidence. You couldn't even tell what the percentage of the wood fiber would be just from the specs. You'd have to do testing on the repro itself, which they never did. The reason that comes up is because they only thought of that later. Originally, the group 1 patents were our product. Our ultimate product was accused of group 1 patents, even though the claims clearly go for just the composition. Well, I take it that the Young's modulus of... If I have, for example, a baseball bat, I can test the Young's modulus of the bat. If I chop it into 16 pieces, I can still test the Young's modulus of each of those pieces and I will obtain, presumably, the same result, correct? You should. I mean, assuming a consistency throughout the bat. So the fact that these are all in chip form, and it looks like many, many tiny chips, but nonetheless, you could test the Young's modulus of each of these chips, right? You could. And you would assume, assuming that the product is thoroughly mixed, that you would achieve the same Young's modulus with respect to each chip that you would for the structural member that you started with. You would think so, but then that deals with the question of why it was defective to begin with. That's your argument, is that it was defective and therefore it might not have had the same properties. But that's not my group. Can I ask you one quick final question on the injunction? The only thing I think the district court said was concluding that this is not a case where the equitable power of the court would be well served. Now, you go on in your brief to spend eight pages or so dealing with each of the factors and analyzing those factors. But how are we to review the court's decision under abuse of discretion when there's no analysis or no detail on what the court's thinking was? Well, I think the issue is abuse of discretion. And those are the factors that were presented to it and the evidence that was presented to it and the connection to each one. In terms of review of that here, I realize it's difficult if the court doesn't say much. Essentially, when you deal with the four factors here, I think the net result is that any reasonable court would conclude that a permanent injunction for some product that was stopped six years ago or five years ago for reasons of defects in it is probably inappropriate. In fact, there's no harm to that. Well, if there is something that you think is important for us to hear orally that is not perhaps adequately covered by the briefs, why don't you allude to it at least? The only thing I would say on the injunction should be Mr. Sheets referred to as licensee and what they were doing. And there's no evidence of that in the record other than there is a licensee. And as a practical matter, an injunction from the past for what we stopped selling as of 2000 doesn't affect the market today. Our current product still doesn't infringe because they abandoned their infringement chain. So nothing will change in the market. And you're content to leave the cross-appeal issues to the briefs? I believe so, yes, because the anticipation is a contingent agreement. I understand. Any further questions? Thank you, Mr. Skinner. Now, Mr. Sheets, we will give you your full rebuttal time if you need it. You shouldn't feel obliged to use it. If you need it, it's yours. A couple of points, Your Honor, back to trying to have a nutshell response to the omnibus spec. If you go right to the spec of the 027, it says unambiguously more particularly the invention relates to an improved structural metric. So if someone wants to know what the invention of the structural metric patents are, if you go to the claim, it says a structural metric. If you go to the spec, it says a structural metric. If you look at the file history and beyond, what it really says is the presently claimed composite is prepared. In other words, we've got the process here, how you prepare it, and then what you have at the end. We claim what you have at the end. We've got this in the record. A lot of patents came out of these files. We've got metric patents. We know how to write metric patents and get metric claims. That's not what this is. This is an end product claim. We may put a pellet in the extruder to come out with an end product. They may put polyvinyl chloride powder and wood to the extruder to come out with that end product, but it's the end product that's claimed. When you talk about the intimate mixing, that's critical to get the structural properties. If you don't intimately mix, you're not going to get the structural properties. If you look again, and I think this is important, in the claims, or in the spec, after we talk about making the pellet, then we simply go into column 7 of the 027 patent, A137, line 14. In a similar fashion, the pellet materials, the invention, are introduced into the extruder and extruded into the structural member. Basically, you're taking the same process you used to extrude the pellet. Then you toss the pellet in and you extrude the structural member. Mr. Skenyon had it right when he said, yeah, you make a pellet because what you can do, it's easier to store and shelf life and put it on the side. When your time comes to make the structural member, instead of mixing some wood and mixing some powder, you toss in the pellet is what you do. That's the only difference. We have an end product claim, and I think it's  Enough said on that. I thank the court for that. I'm a repro touching briefly on that issue to finish up here. The context, of course, is that we were SJ'd. There was some judgment against us on that. Despite these facts, it is like a baseball bat chopped up. We tested product that you brought into the store. There's testimony that sometimes the product's defective when it comes out. It's not defective because it was tested not to have certain properties. There's nothing in the record about that. It's warped. Maybe the coloration isn't right. They toss it in the pile. They chop it up. Then they take that chopped up stuff and they put it back in just exactly like we do with the pellets here. Even though we didn't test the pellet, that's correct. We tested product that came off of their extruders. There's testimony in the record that that product, sometimes defective, is chopped up, stored, and then tossed back in the extruder. It's not a leap at all. It's circumstantial evidence that the intermediate does in fact have the same properties as this stuff that we tested. That was our expert's opinion. The court held no material issue of dispute. In fact, we think that was wrong. I thank the court very much for the time it allotted me at the beginning. Thank you. Thank you. Thank you both counsel. The case is submitted.